IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

A.H., a minor,                          )
by Tarissa Williams,                    )
                                        )
          Plaintiff,                    )
                                        )      No. 09 C 6981
     v.                                 )
                                        )      Magistrate Judge Nan R. Nolan
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
          Defendant.                    )


## MEMORANDUM OPINION AND ORDER

Plaintiff A.H., a minor, filed this action through her mother, Tarissa Williams ("Ms. Williams"), seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1382c. After consenting to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), the parties filed cross-motions for summary judgment. For the reasons stated below, Ms. Williams's motion is granted, and the case is remanded for further proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

Ms. Williams applied for SSI on behalf of A.H. on February 9, 2006, when A.H. was ten years of age.[1] (R. at 101, 109). Ms. Williams alleged that her daughter had

---

[1] The Administrative Law Judge ("ALJ") stated in his opinion that Ms. Williams first

become disabled as of January 1, 2000 because of problems related to A.H.'s learning and physical abilities, her communication and interpersonal skills, her capacity to care for her personal needs, and her ability to pay attention to limited tasks. (R. at 101, 109, 112–18). Of particular concern to Ms. Williams was the fact that A.H. had marked difficulty in focusing on tasks like her school work and reading and on personal activities like dressing and hygiene. (R. at 113, 116).

The application for SSI benefits was denied initially and on reconsideration, after which Ms. Williams filed a timely request for a hearing. (R. at 55, 60, 65). On November 6, 2008, Administrative Law Judge ("ALJ") James Horn conducted a hearing at which both Ms. Williams and A.H., who was represented by counsel, testified. (R. at 29–52). On February 23, 2009, the ALJ determined that A.H. was not disabled within the meaning of the regulations governing childhood disability. (R. at 16–28). The Appeals Council denied Ms. Williams's request for a review on September 9, 2009 (R. at 1), and she filed this action on November 6, 2009 seeking judicial review of the ALJ's ruling, which stands as the Commissioner's final decision.

## II. LEGAL STANDARD

Prior to 1996, a child was considered disabled if he or she had a physical or mental impairment that was of comparable severity to one that would disable an adult. 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.924; *Scott v. Barnhart*, 297 F.3d 589, 593–94 (7th Cir. 2002). Congress altered this standard under the Personal Respon-

---

applied for SSI benefits on January 12, 2006. (R. at 16). The record shows that the application was filed on February 9, 2006.

sibility and Work Opportunity Reconciliation Act ("PRWORA") to require a more stringent showing by a juvenile claimant seeking SSI disability. *Scott*, 297 F.3d at 594 n.5. A child is considered disabled under the PRWORA standard if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations" for a period of at least twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); *Harris v. Barnhart*, 231 F. Supp. 2d 776, 779–80 (N.D. Ill. 2002).

## A. The Three-Step Evaluation Process

To determine if such an impairment exists, the Social Security Administration ("SSA") has promulgated regulations that limit the familiar five-step process applicable to adult claimants to three steps. The ALJ's inquiry asks: (1) is the child engaged in substantial gainful activity? (2) does the child have a medically determinable impairment that is severe? and, (3) do these impairments meet, medically equal, or functionally meet one of a list of severe impairments set forth in the regulations? ("a listing requirement" or "the listings"). 20 C.F.R. § 416.924(b)–(d). An affirmative answer at step one ends the analysis, and a child must be found not to be disabled regardless of her age or medical condition. *Id.* § 416.924(b). A negative answer at step two also requires a finding that the child is not disabled. *Id.* § 416.924(c).

Unlike the step three requirements applicable to an adult claimant—which refer only to an impairment that "meets or equals" a listing requirement, 20 C.F.R. § 416.920(d)—the regulations state that a child also satisfies the third step when her condition functionally equals a listed impairment, *id.* § 416.924(d). This require-

ment, on which A.H. relies, permits a finding of disability if a child's impairment or combination of impairments result in one of two possible findings. First, the impairments must give rise to "marked" limitations in two of six "domains of functioning," including (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. *Id.* § 416.926a(a), (b)(1)(i)–(vi). A limitation is marked if it "interferes seriously" with a child's ability to independently begin, sustain, or finish activities. 20 C.F.R. § 416.926a(e)(2)(i). Such a limitation is "more than moderate" and is equivalent to what one would expect for the functioning level of a child whose standardized test scores are at least two, but less than three, standard deviations below the mean. *Id.*

In the alternative, impairments functionally equal a listing requirement when they constitute an "extreme" limitation in one of the six domains of activity. 20 C.F.R. § 416.926a(a). A limitation is extreme if it "very seriously" interferes with a child's ability to initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). An extreme limitation indicates the "worst limitations," though it does not require a complete loss of functioning. It indicates a functioning level expected for a child whose standardized test scores are at least three standard deviations below the mean. *Id.*

## B. Standard of Review

As with an ALJ's decision concerning an adult, judicial review of a decision denying SSI benefits to a child claimant is limited to determining whether the ALJ ap-

plied the correct legal standards in reaching his or her decision and whether there is substantial evidence to support the relevant findings. *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001); *Harris*, 231 F. Supp.2d at 779. Substantial evidence means such evidence that a reasonable person could accept as sufficient to support a conclusion. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). A reviewing court may not engage in its own analysis of whether a plaintiff is severely impaired, nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

The evidence relevant to whether a child's limitations are marked or extreme involves both medical and nonmedical sources. Medical evidence includes formal testing that provides information about a child's development "in terms of percentiles, percentages of delay, or age or grade equivalents," as well as opinions from treating and consulting medical sources. 20 C.F.R. § 416.926a(b)(3), (e)(1)(ii). When available, such scores are considered in combination with other information about the child's functioning that is available in order to determine if a limitation is marked or extreme. *Id.* § 416.926a(e)(1)(ii). This additional information can be derived from descriptions of a child's functioning that are obtained from parents, teachers, or other people who know the child and can describe relevant activities in school, at home, or in the community. *Id.* § 416.926a(b)(3), (e)(1)(i).

Although a court accords great deference to an ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott*, 297 F.3d at 595 (internal

citation and brackets omitted). A court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young*, 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## III. FACTUAL BACKGROUND

A.H. was born on May 27, 1995 and was thirteen years of age at the time of the hearing. She lives with her mother and three siblings in Aurora, Illinois and was a special education student attending the seventh grade at Granger Middle School when the hearing was held.

### A. School History

A.H. first exhibited learning and developmental delays as a kindergarten student at McCarty Elementary School. Based on classroom observations and concerns expressed by reading and speech instructors, school officials determined that A.H. had not met the kindergarten level of achievement. (R. at 165). Accordingly, Ms. Williams agreed to have A.H. repeat kindergarten in order to provide her daughter with the skills she needed to progress to, and succeed in, the first grade. (R. at 166). This strategy worked, and A.H. began first grade in the 2002-03 school year at Indian Prairie Community School. Her teacher there noted that A.H. enjoyed school and developed friendships with other students. (R. at 191). Her academic skills, however, continued to present problems. A.H. required additional support and attention to complete tasks, and she experienced particular difficulty with math and

language skills. (R. at 189–91). In reading, for example, she could identify only five of forty pre-primer sight words, and she scored a 14 out of a possible 90 on the Darrell Morris Developmental Spelling Test. (R. at 190).

Concerned about the slow pace of A.H.'s development, Indian Prairie school officials recommended in October 2002 that she undergo an evaluation for special education services and that she be checked for any medical conditions that might be affecting her school performance. (R. at 179). Ms. Williams, who was also worried about her daughter's progress, consented to this request. (R. at 183, 185). A Teacher Report Form dated March 11, 2002 confirms the school's and Ms. Williams's concerns. A.H. ranked in the top quarter of her class in behavior and social skills but was in the bottom quarter for study skills; in core subjects such as reading, writing, math, and science, she was placed in the bottom ten percent. (R. at 187). Based on the evaluations that followed, A.H. was placed in special education and given modifications in sixty percent of her school curriculum. (R. at 406).

The first of numerous Individualized Education Program ("IEP") meetings was held on February 4, 2003.[2] (R. at 242). The IEP team determined that A.H. had a learning disability in seven areas, including written and oral comprehension, reading, math calculation, and math reasoning. (*Id*.). Numerous reports made on or around the same date supported the IEP team's finding. (R. at 216–19). The school's

---

[2] An IEP is a written statement required by the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 *et seq.*, that maps out how a school district will provide a "free and appropriate public education" that is tailored to a disabled student's individual needs. *See Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 905–06 (7th Cir. 2002). The programs are developed by a team of parents, teachers, and other school representatives. 20 U.S.C. § 1414(d)(1)(B); *James D. v. Bd. of Educ. of Aptakisic-Tripp Comm. Consol. Sch. Dist. No. 102*, 642 F. Supp. 2d 804, 812 n.2 (N.D. Ill. 2009).

speech pathologist, for example, determined that A.H.'s receptive and expressive language skills were below average, although speech production and fluency were normal. (R. at 224). Tests administered by school psychologist Phyllis LaRiviere confirmed that A.H.'s cognitive abilities were below the average range. Ms. LaRiviere administered the Wechsler Intelligence Scale for Children, which tests intellectual abilities. The test showed that A.H.'s verbal and nonverbal abilities were below normal and that she had extreme difficulty in defining words, assembling puzzles, and computing numbers. (R. at 226). Most difficult, however, were tasks that required attention, concentration, and listening skills. (*Id*.). The Woodcock-Johnson Tests of Achievement III, which measures academic achievement and knowledge, also showed that A.H.'s abilities were considerably below the average range. (R. at 228).

A subsequent IEP review was held the following year in January 2004 when A.H. was in the second grade. The IEP team again agreed that A.H. should remain in a supported placement setting, with special services given in speech and language therapy, as well as social services. (R. at 282–83). By April, 2005, however, A.H.'s teachers were concerned enough about her progress to push her three-year comprehensive evaluation forward by a year. (R. at 314). Classroom teacher Corinne Bluhm had already concluded on February 8, 2005 that A.H.'s math and reading skills were at the first grade level, and her written skills were at the second grade level. (R. at 389, 396). The IEP team also noted that the concerns that had initially led to A.H.'s supported placement had not been alleviated. Her reading level was

between the kindergarten and first-grade level, and her full-scale IQ was 69, a drop of eight points from the earlier 77 that she earned in 2003. (R. at 317, 322). The team concluded that A.H.'s academic skills were two years behind what would ordinarily be expected, with verbal comprehension falling within the low average range and "all other areas severely delayed." (R. at 311, 325–26).

As noted below, A.H. was placed on medication to treat attention deficit disorder ("ADD") in September, 2005. Some indications in the IEP meeting held in March 2006 indicate that A.H.'s functioning improved after she was placed on medication. Social worker Lisa Schlesigner, for example, stated that A.H.'s overall demeanor was happier and more alert. (R. at 408). Nevertheless, special education teacher, Lisa Ebel, reported that A.H.—now in the fourth grade—could do math only at a second-grade level, read at the first-grade level, and write as one would expect a kindergarten student to do. (R. at 300–07). Overall, the IEP team reported that A.H. was following a modified form of the fourth-grade curriculum in social studies, a second-grade math book with modifications, and that she was reading independently only at the first-grade level. (R. at 404). As before, school officials noted that A.H. was both social and very polite, though she continued to "shut down" and fail to complete her tasks. (R. at 404–05).

In the 2006-07 school year, A.H. was a fifth grade student at Gwendolyn Brooks Elementary School. An IEP team that convened on March 21, 2007 noted that A.H. was now receiving support for eighty percent of the school day, but that she was showing steady academic growth. (R. at 430). Reading comprehension was still at

the end of a first grade level, but she had made slow gains in word recognition. Her listening comprehension, moreover, was much higher. (*Id*.). Math, a relative strength for her, was done on a modified fifth grade level, and spelling had shown some improvement. (R. at 431). The IEP noted in particular that A.H. had developed friendships at school and that she had shown "slow growth and mastery of most of her [IEP] goals and objectives in the area of reading, written language and math." (R. at 432). The 2007 results under the Illinois Alternate Assessment showed that A.H. was "progressing" in writing and that she had successfully completed all the tasks on the test. (R. at 475–76).

The final IEP in the record took place on May 14, 2008 when A.H. was in the sixth grade. A.H. was receiving an adaptation (involving only a change in the method of presenting information) or a modification (a change in the content itself) in four of her five core academic subjects. (R. at 462). The IEP team noted that A.H. continued to make progress in her studies, although she began the school year with disciplinary problems and a feeling that she was "retarded." (R. 468). She began to engage more fully with her reading after a new reading program was introduced, and her reading ability improved from the first grade level noted the year earlier to a grade 2.7 level. (R. at 464, 468). The team noted in particular that A.H.'s math skills "took off" during the school year, and she earned an "A" in that subject. (R. at 468). Written expression, however, remained a topic she could perform only at a 1.2 grade level. A.H. earned a "B" in English as well as in Reading, Study Skills and PE, and she was given a "C-" in Science. (*Id*.). Overall, the IEP team concluded that

her Monitoring Score should be marked at the highest level of "improving," that her behavior had shown significant improvement, and that A.H. "began to see she could participate in the grade level class activity if she put her mind to it." (*Id*).

## B. Medical History

### 1. General Health

As part of A.H.'s evaluation for special education services in 2002, she underwent medical testing to determine what effect, if any, her health was having on her academic performance. An initial health and vision screening did not reveal any problems, but subsequent testing showed that A.H. failed a test for close vision in February 2003. (R. at 187, 196). She was also required to take Albuterol to control her asthma. (R. at 196). It was also at this time that the first of several references in the record indicated that A.H. had been wetting her pants at school early in the 2002–03 school year. (R. at 197).

The IEP team that met in April 2005 noted that Ms. Williams was concerned that A.H. had been having "staring" episodes. (R. at 353). School officials had also become aware that A.H., although well-behaved and somewhat social, often appeared to be "shutting down" and suffering from anxiety. (R. at 314–15). Accordingly, Ms. Williams took her daughter to see a number of doctors at Loyola University Medical Center ("Loyola"), including Dr. Michael Gill. Dr. Gill was concerned that A.H.'s tendency to stare and to be inattentive could suggest epilepsy, and he also noted that A.H. was suffering from stool and urine incontinence during the day. (R. at 494). A subsequent electrencephalographic exam conducted by Dr. Michael

Macken on July 18, 2005 showed no signs of epilepsy. (R. at 288). As a result, Dr. Gill diagnosed A.H. in September, 2005 as potentially having ADD and prescribed a trial period on Ritalin. (R. at 494). Fortunately, A.H. responded positively to her new medication. Dr. Gill noted on November 8, 2005 that Ritalin had made "a dramatic difference" and that A.H. was considerably more interactive with the people around her, though he did change her medication to Adderall because it could be sprinkled on food. (R. at 493–94).

A.H.'s dosage of Adderall was increased from fifteen milligrams to twenty on September 7, 2006, and then to twenty-five on November 2, 2006. (R. at 492–93). The last increase was intended to help control A.H.'s continuing problems with bedwetting and urine control. (R. at 492). Urine and fecal incontinence had remained pressing issues for A.H., and Dr. Gill had noted in July 2005 that she was having trouble controlling these functions during the day. (R. at 494). A.H. was apparently referred to a Dr. Lindgren for treatment, after which her ability to control stool movements improved; only "rare" incidents were noted in January and February 2007 . (R. at 490–93).

Urine problems, however, continued, and A.H. saw a series of physicians in an effort to treat the problem. The records on this issue are not entirely clear, but on January 31, 2007, Ms. Williams told Dr. Michael Cahill that A.H. wet herself during the day and at night. (R. at 491). Consequently, Dr. Cahill referred A.H. to Dr. Kamini Kalola. Dr. Kalola noted on February 1, 2007 that A.H. was wetting herself daily and still had some bowel incontinence. (R. at 490–91). Dr. Kalola recom-

mended that A.H. keep a voiding diary and diagnosed her with enuresis and enco-

presis.[3] (*Id.*). On the same day, A.H. also saw Dr. David Hatch, who recommended

the same diary. Dr. Hatch noted that A.H. wetted herself with small, and occasion-

ally large, flows seven days out of the week but appeared to be otherwise normal.

(R. at 490). On March 14, 2007, the diary revealed that A.H. continued to wet her-

self six days a week, and Dr. Hatch administered a trial dose of Enablex to help con-

trol her incontinence. (R. at 489). The record does not directly reflect what success

A.H. had on this drug, but records from other physicians indicate that A.H. contin-

ued to take Enablex at least through July 2008. (R. at 497).

### 2. *Psychological Records*

The earliest concerns about possible psychological problems facing A.H. arose in

July, 2005, when Dr. Gill noted that A.H. had been evaluated by a Dr. Bradzunias.

(R. at 494). Dr. Bradzunias's notes are not part of the record, but Dr. Gill states that

Dr. Bradzunias believed A.H. could have a learning disorder, ADD, and, possibly, a

depressive disorder. (*Id.*).

#### a. *Dr. John Peggau*

On April 14, 2006, A.H. underwent an exam by psychologist Dr. John Peggau,

who evaluated the fourth grade student as part of the disability claim Ms. Williams

filed on behalf of A.H. Dr. Peggau noted that A.H.'s full-scale IQ scored at 73, plac-

ing her in the "borderline mentally deficient" range. Her perceptual reasoning also

---

[3] Enuresis refers to an inability to control urination and may be either nocturnal or di-
urnal. Encopresis involves repeated fecal incontinence in children. The Merck Manual 1960,
2482 (18th ed. 2006).

fell in this category with a score of 73. A.H.'s processing speed was within the extremely low range, while her working memory was low average, and verbal comprehension was average. (R. at 358). Dr. Peggau noted in particular that A.H. was frequently "very careless and very hasty" in completing her tasks, but he ruled out hyperactivity or any showing of an attention deficiency. (R. at 360). Overall, Dr. Peggau determined that A.H. functioned at a low average level and diagnosed a learning disability, NOS (not otherwise specified). (R. at 358, 360). He assigned A.H. a Global Assessment of Functioning ("GAF") score of 65–70.[4] (R. at 360).

### b. Dr. Agnes Costello

On October 31, 2006, A.H. was referred to psychiatrist Dr. Agnes Costello for ADD and the management of her urine and bowel functions. (R. at 500). A.H. was eleven years old at the time. Ms. Williams told Dr. Costello that A.H.'s inattentiveness had significantly improved since Adderall had been added to her medications. (*Id.*). Dr. Costello diagnosed A.H. with attention deficit/hyperactivity disorder ("ADHD") of the inattentive type, with secondary enuresis and encopresis as a result of her incontinence issues. She noted that A.H.'s motor activity was normal, that she was not guarded, and that her thought processes were coherent. (R. at 502). Dr. Costello assigned A.H. a GAF score of 60. (*Id.*).

---

[4] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000).

### c. Dr. Earlene Strayhorn

On July 15, 2008, A.H. also saw psychiatrist Dr. Earlene Strayhorn when A.H. was thirteen years old. Dr. Strayhorn noted that A.H. was very shy, showed no signs of anxiety, and was an "intelligent warm young girl." (R. at 499). Like Dr. Costello, Dr. Strayhorn also diagnosed A.H. with ADHD, inattentive type, as well as having enuresis or encopresis. She recommended that A.H. continue to take twenty-five milligrams of Adderall. (*Id.*). Like Dr. Costello, Dr. Strayhorn also gave A.H. a GAF score of 60. (*Id.*).

## C. State Agency Determinations

On May 12, 2006, David Brister, Ph.D., a state agency psychologist, completed a Childhood Disability Evaluation Form concerning A.H. (R. at 372). After reviewing A.H.'s school records and vision exams, as well as Dr. Peggau's evaluation, Dr. Brister found that A.H. had an impairment or a combination of impairments that was severe but which did not meet, medically equal, or functionally equal a listing requirement. (R. at 371). No limitation was found concerning A.H.'s ability to move or manipulate objects. (R. at 374). A marked limitation was indicated for her ability to acquire and use information, and less than marked limits were found for the functional domains of attending and completing tasks, interacting with others, caring for oneself, and physical well being. (R. at 373–74). On July 24, 2006, Erika Altman, Ph.D. reached the same conclusion except for the domain of health and physical well being, in which Dr. Altman found no limitation. (R. at 380–85).

## D. Hearing Testimony

Both A.H. and Ms. Williams testified before the ALJ at the hearing held on November 6, 2008. A.H. briefly stated that she enjoys school and has two teachers for each class. This includes a teacher who addresses the needs of both regular and special education students in the same room, plus an additional aide for A.H. alone. (R. at 38, 43). She does not like to read, but her mother tries to make her do so at home. Ms. Williams must also ask A.H. up to four times to do her daily chores at home. (R. at 44–45).

Ms. Williams confirmed that A.H. remains in the general classroom with other children, where she receives a modified curriculum to meet her specialized educational needs. (R. at 37–38). Although Ms. Williams found it difficult at first to accept that A.H. had ADHD, the medication that was prescribed to treat her condition has helped her function better. (R. at 38, 47). However, the medication's benefits are not as apparent as Ms. Williams would prefer at home because its effect wears off by the time A.H. returns from school. (R. at 46–47). This complicates A.H.'s functioning at home because she is not always attentive to her tasks. For example, A.H. frequently begins a job given to her by Ms. Williams, such as making her bed, only to turn to another activity before the first is complete. (R. at 42). At times, she is not able to find her shoes even though she is holding them in her hands. (R. at 51).

Although she is usually very respectful and social, A.H. is not always cooperative and becomes aggressive without her medication. (R. at 39–40, 51). Ms. Williams noted in particular that A.H. has a tendency to "shut down" and is especially resis-

tant to reading. (R. at 40–41). Ms. Williams stated that A.H.'s behavior is variable. On some days she works with her teachers and focuses on her tasks; on other days she is less cooperative. (R. at 42–43). Nevertheless, A.H. showed improvement in this area within the year before the hearing and is now more willing to read at school, though she continued to refuse to read at home. (R. at 40–41). Ms. Williams also expressed concern over A.H.'s ongoing problem with urinary and fecal incontinence, which is more pronounced during the day than at night. A.H. often has toilet accidents because she becomes distracted, but Ms. Williams cannot keep track of how many such incidents occur because A.H. throws her underwear away or tries to hide it from her mother. (R. at 46).

## E. The ALJ's Decision

The ALJ denied Ms. Williams's request for benefits on behalf of A.H. on February 23, 2009. (R. at 27–28). Applying the three-step sequential evaluation process, the ALJ found at step one that A.H. had never engaged in substantial gainful activity. (R. at 19). At step two, he determined that she had the following severe impairments: a history of speech delay, borderline intellectual functioning/learning disorder, vision deficits, ADHD, incontinence, and asthma. (*Id*.). The ALJ also found at the first part of step three that A.H. did not have an impairment, or a combination of impairments, that met or medically equaled, listing 112.05 of 20 C.F.R. part 404, subpart P, appendix 1, governing mental retardation, or listing 112.11, which addresses ADHD. (*Id*.). According to the ALJ, A.H.'s IQ scores did not show the sub-

average intellectual functioning required to meet listing 112.05, and no medical evidence supported a finding that her ADHD met the criteria of listing 112.11. (*Id.*).

The ALJ also found that A.H.'s severe impairments did not functionally equal a listing requirement. The ALJ concluded that A.H.'s medical problems could be expected to produce her symptoms, but he found without further reasoning that statements at the hearing concerning the extent of her limitations were not entirely credible. (R. at 22). The ALJ found that A.H. had a marked limitation in the functional domain of acquiring and using information, but had no limitation in moving about and manipulating objects. (R. at 23, 26). A less than marked limitation was found in the other four domains of attending and completing tasks, interacting and relating with others, caring for oneself, and health and physical well being. (R. at 22–27). The Appeals Council adopted the ALJ's decision on September 9, 2009. (R. at 1).

## IV. DISCUSSION

Ms. Williams challenges the ALJ's decision that A.H. is not entitled to SSI benefits on two grounds: (1) substantial evidence does not support the ALJ's determination at step three, and (2) the ALJ erred by failing to have a medical expert review the school and psychiatric records that were submitted after the November 6, 2008 hearing.

### A. The Step Three Issue

As an initial matter, the scope of Ms. Williams's claims concerning the ALJ's decision at step three is not entirely clear. In her motion, Ms. Williams contends both

that (1) "[A.H.] functionally equals listing 112.02" and (2) "[a] listed impairment is . . . met, equaled, or functionally equaled and [A.H.] is per se disabled." (Pl.'s Mot. 9). Ms. Williams's substantive arguments, however, do not address the second of these claims. As explained above, the standard that determines whether a limitation "meets or medically equals" a listing differs significantly from that which addresses when a limitation "functionally equals" a listed impairment. Both child and adult claimants satisfy the "meets or medically equals" standard when they demonstrate how their impairments meet all the specific criteria stated in Appendix 1 for a particular listing. *Baker v. Barnhart*, 410 F. Supp. 2d 757, 760 (E.D. Wis. 2005). Ms. Williams, however, does not attempt to show how A.H.'s limitations relate to listing 112.02 (organic brain disorders)—which the ALJ did not consider in his decision—or to the listings the ALJ actually relied on, 112.05 (mental retardation) and 112.11 (ADHD).[5] *See* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 112.02, 112.05, 112.11.

The Court, therefore, interprets Ms. Williams's argument as being limited to the claim that the ALJ erred in finding that A.H.'s limitations do not functionally equal a listing category. The "functionally equals" standard does not involve the criteria in Appendix 1 for any specific listing. These criteria fall away because an ALJ determines functional equivalence only after she has concluded that a child's impairments do not meet or medically equal a listing. 20 C.F.R. § 416.926a(a); *see also id.* §

---

[5] Although Ms. Williams briefly cites listing 112.02 in her motion, she only argues for the first time in her reply that the ALJ erred by not considering it in his decision. Issues that are asserted for the first time in a reply are waived. *See TAS Distributing Co. v. Cummins Engine Co.*, 491 F.3d 625, 630–31 (7th Cir. 2007) (noting that "it is well-settled that arguments first made in the reply brief are waived."). Accordingly, the Court does not consider whether the ALJ should have applied listing 112.02 to A.H. or if his reliance on listings 112.05 and 112.11 was erroneous.

416.926a(d) ("We will not compare your functioning to the requirements of any specific listing."). At this stage, the ALJ may determine that a child's impairments functionally equal the severity of a listing only by assessing whether the child has marked or extreme limitations in the six domains of functioning noted earlier. 20 C.F.R. § 416.926a(a). These domains are, in fact, the criteria on which Ms. Williams bases her motion.

The relevant issue, therefore, is not whether A.H. meets or medically equals any listing's criteria, but whether substantial evidence supports the ALJ's findings concerning A.H.'s domains of functioning. Ms. Williams contends that the evidence shows that A.H. has (1) an extreme limitation in acquiring and using information, (2) a marked limitation in attending and completing tasks, and (3) a marked limitation in caring for herself. (Pl.'s Mot. 9–11).

### 1. Acquiring and Using Information

The SSA regulations state that under the domain of acquiring and using information "we consider how well you acquire or learn information, and how well you use the information you have learned." 20 C.F.R. § 416.926a(g). As for all the functional domains, the regulations governing the domain of information acquisition differentiate tasks based on a child's age. Children between the ages of six and eleven should be able to read, write, do math, and discuss history and science, and they should be able to use these skills in school, at home, and in the community. 20 C.F.R. § 416.926a(g)(2)(iv). A child in this age range should be able to use increasingly complex language, share information, express his or her own ideas, and re-

spond to the opinions of others. *Id.* Children between the ages of twelve and eighteen have additional requirements, including the use of even more complex language, the capacity to understand simple and complex ideas, and the ability to carry out activities of daily living without assistance. *Id.* § 416.926a(g)(2)(v).

The ALJ found that A.H.'s limitations in this domain are marked. (R. at 23). Ms. Williams argues that they are extreme. After acknowledging that A.H. had consistent problems with performing at an appropriate grade level, the ALJ briefly analyzed the first domain: "[A.H.'s] intelligence scores are not so low as to make it impossible for her to achieve a satisfactory level of understanding of that which she needs to learn[,] and all evidence points to considerable improvement in her attention problems with medication." (*Id.*) Ms. Williams first argues that this analysis is deficient because the ALJ took no note of how many standard deviations A.H.'s test scores fell below the mean, and he should have sought some form of testimony on this issue before reaching his decision. (Pl.'s Mot. 9). As noted earlier, an extreme limitation indicates the functional level of a child whose test scores are at least three standard deviations from the mean. The Commissioner responds by pointing out that under Appendix 1, the regulations consider IQ scores to have a mean value of 100, with a standard deviation of 15. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00D(9). As the ALJ noted in his review of the record, A.H. had a full IQ score of 73 on her WISC-IV test in 2006. (R. at 21). Therefore, the Commissioner argues, A.H. is within two, but less than three, standard deviations of the mean of 100, and

substantial evidence supports the ALJ's conclusion that A.H.'s impairments were only marked. (Def.'s Mot. 4–5).

The Court disagrees with Ms. Williams that, standing alone, the ALJ's failure to calculate a standard deviation constitutes reversible error. The regulations place some weight on both standardized test scores and standard deviations, but they do not make either factor dispositive. The regulations state that an ALJ "will consider" test scores together with a child's functioning. 20 C.F.R. § 416.926a(e)(ii). They do not require an ALJ to calculate standard deviations, however, noting only that test scores "can be converted to standard deviations." *Id*. Prior to the inclusion of this language in 2001, the Seventh Circuit held that an ALJ's reliance on raw test scores alone is not erroneous when other evidence supports the ALJ's conclusions about a child's domains of functioning. *Flener v. Barnhart*, 361 F.3d 442, 449 (7th Cir. 2004) (noting the "the failure to obtain standard deviations . . . was certainly not a significant, prejudicial omission of the type compelling reversal").

The Court does not believe that the 2001 regulatory language quoted above alters *Flener*'s holding to such a degree that an ALJ's failure to calculate standard deviations, without more, warrants automatic reversal. As the Commissioner points out, listing 112.00D(9) provides a method for calculating standard deviations for a child's IQ scores, and courts have taken notice of such deviations even where an ALJ has not calculated them. *See Moore v. Barnhart*, 413 F.3d 718, 723 (8th Cir. 2005) (calculating standard deviations based on listing 112.00D(9) on the court's own motion); *but see Fontanez v. Barnhart*, 195 F. Supp. 2d 1333, 1357 (M.D. Fla.

2002) (finding that the failure to convert raw scores into standard deviations requires reversal). Equally important, the regulations are clear that an ALJ may not rely on any single test score when deciding if an impairment is marked or extreme. 20 C.F.R. § 416.926a(e)(4)(i); *see also id.* § 416.924a(1)(ii) ("[W]e will not rely on test scores alone when we decide whether you are disabled."). As Social Security Ruling ("SSR")[6] 09-3p makes clear, the domain of acquiring and using information "considers more than just assessments of cognitive ability as measured by intelligence tests, academic achievement instruments, or grades in school."

Notwithstanding this conclusion, the Court agrees with Ms. Williams on other grounds that substantial evidence does not support the ALJ's finding that A.H.'s limitations in this domain are only marked. As SSR 09-3p suggests, an ALJ must consider more than just IQ scores when considering a child's level of impairment. He must also find that the child's daily functioning level is consistent with those scores. 20 C.F.R. § 416.926a(e)(4)(ii). In fact, evidence about a child's daily functioning can trump test results, and the child can be found to have a marked or extreme limitation even if her IQ is above or below the standard deviations provided for in the regulations. *Id.* § 416.926a(e)(4)(ii)(A)–(B).

The ALJ in this case did not account for A.H.'s daily functioning or determine if it accorded with her IQ scores. The Commissioner argues that this oversight is not

---

[6] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

fatal because other evidence in the record supports the ALJ's decision. Dr. Costello, for example, noted in 2006 that A.H. provided an "appropriate detail of information" to the psychiatrist's inquiries, and Dr. Strayhorn stated in 2008 that A.H. had age-appropriate judgment and insight. (R. at 502, 499; *see* Def.'s Mot. 5). The problem with this argument is that the ALJ did not rely on any of the evidence the Commissioner cites to reach his conclusion on A.H.'s functioning in this domain. Although he took nominal notice of Dr. Strayhorn's and Dr. Costello's reports in his survey of the record, the ALJ did not discuss their conclusions about A.H.'s ability to acquire information, or even note that such conclusions had been made. (R. at 21, 22).

As with all his functional findings, the ALJ also failed to link his specific domain decision to any part of the record or to provide an evidentiary basis for the very different criteria that apply to each of the various domains. It is well established that an ALJ "must articulate at some minimal level his analysis of the evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's one-sentence analysis did not do so here, erroneously leaving the Court to guess at how he reached his conclusion based on the evidence he reviewed. *See Baker*, 410 F. Supp. 2d at 766 (explaining that an ALJ may not summarize the evidence without explaining how it supports his decision).

Instead of providing concrete evidentiary support for this domain, the ALJ relied on A.H.'s IQ score and unspecified evidence that she was showing "improvement." (R. at 23). Ms. Williams argues that the concept of improvement is inapplicable to a functional equivalence determination because the proper standard is how

A.H. compares to other, nonimpaired children, not how she relates to an earlier version of herself. (Reply at 4). The Court agrees that, at least without more discussion than the ALJ provided here, reliance on a child's academic improvement does not constitute substantial evidence to support a functional analysis of the domain of acquiring information.[7] The regulations governing an initial determination of childhood disability do not ask an ALJ to consider improvement but rather to "compare your functioning to the typical functioning of children your age who do not have impairments." 20 C.F.R. § 416.926a(f)(1); *see also* SSR 09-2p ("The critical element in evaluating the severity of a child's limitations is how appropriately, effectively, and independently the child performs age-appropriate activities."). Presumably, a child with serious limitations could show a measure of progress and still fall within the marked or extreme functional categories compared to other children her own age. A.H.'s sixth-grade IEP of May 14, 2008, for example, showed that her ability to read had clearly improved from the year earlier, but at a grade 2.7 level, it still remained far below the level of her nonimpaired classmates. (R. at 468).

The ALJ also stated somewhat vaguely that, although A.H. did not meet her grade level, her intelligence scores showed that it was not "impossible for her to

---

[7] The Court recognizes that a number of issues related to a child's general "improvement" can arise in disability cases. An ALJ, for example, is required to consider improvements in a child's medical condition when deciding whether or not a child who has already been found to be disabled is entitled to continuing benefits. 20 C.F.R. § 416.994a(b)(1). No equivalent standard applies to the initial determination of disability. Improvement is also an important measure for a child like A.H. who has been placed in special education because the IDEA's mandate of a "free and appropriate public education" is met when a student makes at least some progress toward meeting the goals outlined in an IEP. *See James D.*, 642 F. Supp. 2d at 827. SSR 09-2p cautions, however, that IEPs are not designed to determine disability, and the same ruling notes that a special education child like A.H. can achieve her IEP goals, thereby showing improvement, and "still have limitations."

achieve a satisfactory level of understanding of that which she needs to learn." (R. at 23). In light of the ALJ's acknowledgment that A.H. could not perform at grade level, the Court assumes that his reference to A.H.'s "satisfactory level of understanding" indicates the special education standards under which A.H. received the grades referred to in the ALJ's decision. For example, the ALJ found it noteworthy in his general survey of the record that A.H. received grades of "B" or better in five out of seven subjects in 2008, and that her readings skills improved late in that school year after a new reading program was used. (R. at 20).

In doing so, however, the ALJ again failed to compare A.H.'s abilities to nonimpaired children her age. The social security ruling that addresses this domain stresses that an ALJ should "focus first on the child's activities, and evaluate how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments." SSR 09-3p. The ALJ here did not consider the fact that A.H.'s grade of "B" in sixth-grade reading only reflected an actual ability to read at a grade 2.7 level, or that her grade of "B" in English indicated the capacity to write at the grade 1.2 level. (R. at 464, 468). Satisfactory grades awarded to special education students receiving support and modifications cannot automatically be equated to the grades of nonimpaired children without more discussion than the ALJ provided here. *See* 20 C.F.R. § 416.924a(b)(7)(iv) ("[W]e will consider that good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments.").

Insofar as the ALJ may have intended his analysis to compare A.H. to her non-impaired peers, his summary of the evidence took almost no notice of the modifications and support A.H. received in school. SSR 09-2p takes particular care in describing the account ALJs must take of the extra supports a special education child receives:

> This information about supports children receive can be critical to determining the extent to which their impairments compromise their ability to independently initiate, sustain, and complete activities. In general, if a child needs a person, a structured or supportive setting, medication, treatment, or a device to improve or enable functioning, the child will not be as independent as same-aged peers who do not have impairments. We will generally find that such a child has a limitation, even if the child is functioning well with the help or support. The more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independently the child functions, and the more severe we will find the limitation to be.

Notably, the ALJ's only references to special education state in broad terms that A.H. began receiving such services in 2005, that she still required them in March 2007, and that Ms. Williams testified that A.H. continued to receive them at the time of the hearing. (R. at 20–22). The ALJ, however, did not consider any of the specific supports and modifications A.H. received as part of her IEPs, thereby failing to take into consideration the circumstances surrounding her situation and how these modifications may have affected A.H.

An ALJ is not required to discuss every piece of evidence in the record. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). Nevertheless, the ALJ's failure in this case to link the evidence he cited to his conclusions, as well as his oversight of the standards applicable to children in special education, means that he did not "build a

logical bridge between the evidence and his conclusion." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). For these reasons, therefore, the Court finds that substantial evidence does not support the ALJ's findings on this issue.

## 2. *Attending and Completing Tasks*

In this domain, the ALJ considers "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h). Attention involves a child's level of alertness, ability to filter out distractions, and capacity to change focus when interruptions occur. *Id.* § 416.926a(h)(1)(i). Children between the ages of six and eleven should be able to focus on a variety of school and home-related activities, including reading and family chores. Those between twelve and eighteen should be able to do so in more complex settings and be able to complete long-range academic assignments. *Id.* § 416.926a(h)(2)(iv)–(v). Examples of limited functioning that could be either marked or extreme include being easily startled, being slow to complete activities, being sidetracked from tasks or easily frustrated, and needing extra supervision to complete tasks. *Id.* § 416.926a(h)(3)(i)–(v).

The ALJ found that due to the medication A.H. took for ADHD, her limitations in this domain were less than marked. As before, a single sentence announced this conclusion: "Both records and testimony reflect considerable control over claimant's attention deficit hyperactivity disorder symptoms with medication." (R. at 24). The Commissioner argues that substantial evidence supports this conclusion because the record shows that A.H.'s ability to focus improved after she was placed on Adderall to help control her ADHD. As before, however, this argument relies almost exclusively on a standard of functional improvement instead of an analysis of the factors specifically required under the regulations. Social Security Ruling 09-4p, which addresses this domain of functioning, does not suggest that an ALJ can find a less-than-marked impairment solely on the ground that a child can attend to tasks better than she could at some earlier time before taking medication. "As in any domain, when we evaluate a child's limitations in the domain of '[a]ttending and completing tasks,' we consider how appropriately, effectively, and independently the child functions to children of the same age who do not have impairments." SSR 09-4p.

Even assuming that the ALJ could rely on A.H.'s progress after taking Adderall, he failed to note that her improvements occurred with the help of the support she was receiving as a special education student, including the many modifications and supports noted in A.H.'s IEPs. An ALJ must consider a child's structured environment as part of his analysis of all the functional domains—a guideline that goes beyond the special education standards discussed earlier to include both special and

regular education classrooms, as well as the child's home environment. 20 C.F.R. § 416.924a(b)(5)(iv)(B). The regulations carefully note that a child may function relatively well within a structured setting and still show significant limitations outside it. Consequently, even if the child functions adequately within a setting like a supportive environment, an ALJ must still consider how the child would fare outside it. *Id.* § 416.924a(b)(5)(iv)(C). Activities in the context of this domain are comprehensively defined as "everything a child does at home, at school, and in the community, 24 hours a day, 7 days a week." SSR 09-4p.

The ALJ did not consider this aspect of A.H.'s record, thereby disregarding significant portions of the record that could be construed as showing a marked impairment in A.H.'s ability to attend to activities and assignments. The regulations specifically state that even a child younger than twelve should be able to read by herself and perform family chores. 20 C.F.R. § 416.926a(h)(2)(iv). The ALJ, however, did not consider any of A.H.'s activities outside of school, even though Ms. Williams testified that A.H. was unable to either read at home or to perform chores. (R. at 40–41). Instead, she frequently turns from one task to another without completing the first one, and was once unable to locate her shoes even though she was holding them in her hands. (R. at 51). Ms. Williams also noted that A.H.'s inattentiveness could be more pronounced at home than at school because the effects of her medication wear off by the time she returns home.[8] (R. at 46–47).

---

[8] The ALJ found Ms. Williams's testimony not to be credible to the extent that it conflicted with his functional determinations. (R. at 22). With the exception of A.H.'s reading habits, however, the ALJ's evidentiary summary did not consider any of the evidence stated above.

The record also contains a number of other examples of A.H.'s inattentiveness that the ALJ did not review. Dr. Peggau, for example, noted that she was "very careless and very hasty" in completing tasks, circled test items "without even contemplating all the opportunities," and could not attend to number sequencing in an age-appropriate manner. (R. at 359). A child who is A.H.'s age at the time of Dr. Peggau's assessment should be able to concentrate on tasks "and not make careless mistakes."[9] 20 C.F.R. § 416.926a(h)(2)(iv).

The ALJ also overlooked A.H.'s day-to-day functioning as reflected in her teachers' notes and IEPs, although he did consider other comments made by her teachers that are not relevant to this domain. For example, A.H.'s last IEP states that she was not always able to attend to tasks and "will leave supplies in her locker, lose books, and refuse to participate in the activity by putting her head down." (R. at 467). IEP comments from the previous year expressed similar concerns about A.H.'s difficulties in staying focused on her tasks. (R. at 442, 452). Both IEPs were conducted after A.H. began taking Adderall. Such evidence is an important source for considering a child's ability to function in the domain of attending and completing tasks. *See Hopgood v. Astrue*, 578 F.3d 696, 701 (7th Cir. 2009) (noting the relevance of teachers' reports in this domain of functioning); *Baker*, 410 F. Supp. 2d at 768.

---

[9] The state agency experts, Drs. Brister and Altman, relied on Dr. Peggau's report to reach their functional determinations for A.H. As explained below, however, the ALJ did not cite the state agency experts as sources for his own functional equivalence decision. Accordingly, the record does not indicate that Dr. Peggau's statements form a ground supporting the ALJ's findings on A.H.'s domains of functioning.

"Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight." *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986); *see also Herron*, 19 F.3d at 333 ("[T]he ALJ's decision must be based upon consideration of all the relevant evidence."). By failing to take notice of A.H.'s supportive environment, and the concerns A.H.'s teachers and mother expressed about her daily functioning, the ALJ overlooked material evidence that could lead reasonable minds to differ as to the extent of A.H.'s impairments in this domain of functioning. The duty to resolve such potential conflicts rests with the ALJ, not with the Court. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). As before, moreover, the evidence summarized in the decision is not tied to the ALJ's analysis of A.H.'s ability to remain focused, and the ALJ again failed to build a bridge between the record and his conclusion. Accordingly, substantial evidence does not support the ALJ's finding that A.H.'s limitations in the domain of attention and completing tasks are less than marked.

### 3. *Caring For Oneself*

For this domain, the SSA regulations state:

> [W]e consider how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area.

20 C.F.R. § 416.926a(k). A child's ability to care for herself involves the child's responses to changes in her environment and her emotions. *Id.* § 416.926a(k)(1)(i).

A child should show increasing skill in becoming independent by relying on her own abilities, show consistent judgment about the consequences of caring for herself, and display competence in the ability to carry out the child's own appropriate feeding, dressing, and toilet functions. *Id.* § 416.926a(k)(1)(ii). Between six and eleven years of age, a child should be able to handle most day-to-day activities independently, even though some reminders may be necessary. A child between twelve and eighteen should become increasingly independent. *Id.* § 416.926a(k)(2)(iv)–(v). Examples of limited functioning in this domain include placing inedible objects in the mouth, self-soothing activities such as thumbsucking, age-inappropriate bathing and dressing, self-injurious behaviors, an inability to pursue enjoyable activities, and disturbances in eating and sleeping patterns. *Id.* § 416.926a(k)(3)(i)–(vi).

The ALJ determined that A.H. had a less-than-marked limitation in this domain and justified his position by pointing to her academic achievements and her daily functioning: "The evidence indicates that claimant needs assistance both inside and outside the classroom with completing tasks. However, with assistance, claimant has managed to progress smoothly in her academic development[,] having only been retained once at the kindergarten level. The evidence also shows an individual who can perform most activities of daily living independently." (R. at 27). Ms. Williams objects to the first part of this rationale on the ground that a special education child who has been held back, and whose academic performance is significantly below her grade level, cannot have the kind of academic progression the ALJ stated. (Pl.'s Mot. 6).

Whatever the merits of this argument, the more fundamental issue here is that A.H.'s academic progress and her ability to complete tasks are not part of the standard governing this domain of functioning. The regulations state that a child's ability to care for herself involves physical and emotional tasks such as feeding, dressing, toileting, and bathing in an age-appropriate way, taking medications, and generally "becoming increasingly independent in making and following your own decisions." 20 C.F.R. § 416.926a(k)(1)(ii)–(iv). They do not address a child's ability to complete tasks, which falls under the attending and completing tasks domain, or her capacity for academic achievement—a topic more properly considered under the acquiring and using information domain. Indeed, the primary reference to school in the regulations applicable to this domain merely states that a child twelve or older should begin to ponder what her plans will be when she finishes school. *Id.* § 416.926a(k)(2)(v). The ALJ, therefore, relied on incorrect legal standards in analyzing A.H.'s ability to care for herself.[10] *See Scivally v. Sullivan*, 966 F.2d 1070, 1075 (7th Cir. 1992) (stating that reversal is required when an ALJ applies an incorrect legal standard).

It is less clear what standard the ALJ used to find that A.H. could perform most of her activities of daily living independently. The regulations do state that a child should show an increasing ability to perform her day-to-day activities in an inde-

---

[10] SSR 09-7p notes that, as in all the domains of functioning, impairments in a child's ability to care for himself may involve limitations in other areas, and an ALJ may "evaluate the effects of the child's impairment(s) . . . in all relevant domains." This does not mean, however, that the standards applicable to other domains can be substituted for those that guide the domain of caring for oneself. Rather, a child's limitations in this area may be considered as part of every domain in which they are relevant to the specific functional criteria provided for under the regulations. *Id.*

pendent manner. 20 C.F.R. § 416.926a(k)(2)(v). The ALJ did not clarify what daily activities were involved in his finding, but his evidentiary survey primarily addresses A.H.'s ability to perform academic and physical tasks on a day-to-day basis. This suggests that her intellectual and physical functions were his primary concern. SSR 09-07p, however, specifically states that the domain of caring for oneself "does not address a child's *physical* ability to perform self-care tasks." "Rather, in 'Caring for Yourself,' we focus on how well a child relates to *self* by maintaining a healthy emotional and physical state in ways that are age-appropriate . . . ." *Id.*

The Commissioner claims that substantial evidence supports the ALJ's finding because A.H.'s school records show that she was making progress in expressing her needs and in handling frustrating situations after she began taking Adderall. (Def.'s Mot. 7). This argument addresses the appropriate factors for evaluating A.H.'s ability to care for herself, but the Commissioner overlooks that the ALJ did not rely on this evidence to reach his decision. Neither the evidentiary summary nor the ALJ's reasoning related to the domain of caring for oneself refers to any of the examples supplied by the Commissioner. The Court cannot restate the ALJ's own evidentiary basis for reaching his decision because "[n]either the Commissioner nor the court may supply reasons for the ALJ" after the fact. *Baker*, 410 F. Supp.2d at 766; *see also Steele*, 290 F.3d at 941 ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.").

The absence of supporting evidence is particularly striking in the ALJ's brief references to A.H.'s difficulties in caring for her bodily functions. In his evidentiary summary, the ALJ noted only three references to A.H.'s incontinence from 2005 through 2007, and he concluded somewhat puzzlingly from such sparse evidence that "[a] pervasive incontinence problem is not reflected in the longitudinal record." (R. at 22). No substantial evidence supports such a finding. The record contains many references to A.H.'s long-term difficulties with urine and fecal control, ranging from her early records for the 2002–03 school year through her July 15, 2008 psychiatric interview with Dr. Strayhorn, who diagnosed A.H. with encopresis, enuresis, and urge incontinence. (R. at 197, 499). Dr. Hatch had A.H. keep a voiding diary in early 2007 that showed that A.H. wetted herself six days a week. (R. 489). As Dr. Strayhorn noted, and as the ALJ overlooked, A.H. also continued to take Enablex as late as July, 2008 to help control her incontinence problems. (R. at 497). It is for the ALJ, not the Court, to determine what functional limitations A.H. has based on this record. The evidence currently cited in the decision, however, is not substantial enough to support a finding that her limitation is less than marked.

This conclusion is bolstered by the fact that the ALJ also failed to account for, or misunderstood, significant portions of Ms. Williams's testimony. He concluded, for example, that Ms. Williams stated that A.H.'s problems in caring for her bodily functions were a side effect of her ADHD medication. (R. at 22). In reality, Ms. Williams stated that A.H.'s problems stemmed from her difficulties in focusing, not from the medication she takes to treat ADHD. (R. at 46). Ms. Williams also testified

that she had to remind her daughter "constantly" to go to the bathroom, that A.H. "shuts down" at home, and that she has difficulties in other self-help activities like making her bed. (R. at 42–46). A.H. herself testified that she sometimes had to be told four times to do a task before accomplishing it. (R. at 44–45). A child below the age of twelve may need some reminding to perform certain acts. 20 C.F.R. § 416.926a(k)(2)(iv). A.H., however, was thirteen at the time of the hearing, and the regulations do not provide for reminders for children twelve and older. *See id.* § 416.926a(k)(2)(v).

The Commissioner contends that the ALJ's decision is still justified because A.H.'s incontinence problems primarily occurred at home and not at school. This argument fails to recognize that the appropriate standard requires an ALJ to consider a child's activities "at home, at school, and in [her] community." 20 C.F.R. § 416.926a(b). Social Security Ruling 09-1p also requires an ALJ to evaluate the "whole child" when considering all the domains of functioning, and this includes "how the child functions every day and in all settings." SSR 09-1p. Thus, the fact that A.H.'s incontinence problems were more pronounced at home than at school does not, in itself, demonstrate that her limitations in this domain are less than marked.

As in all social security determinations, an ALJ is not required to consider every piece of evidence or testimony. *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Nevertheless, "[a]n ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required." *Diaz v. Chater*, 55 F.3d 300, 307

(7th Cir. 1995); *see also Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) ("[W]here the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded.") (internal quote and citation omitted). The ALJ's reliance on incorrect legal standards, combined with his oversight of evidence relevant to A.H.'s ability to care for herself, requires a reversal on this portion of the ALJ's decision.

## B. The Medical Expert Issue

A.H.'s counsel submitted records to the ALJ that were not available at the November 6, 2008 administrative hearing, including reports from Drs. Cahill, Strayhorn, and Costello. (Pl.'s Mot. 6). It may also have included A.H.'s 2008 IEP, as Ms. Williams also claims that no medical expert ever reviewed this latest school evaluation of A.H.'s special education needs. (*Id.* at 13). Relying on SSR 96-6p, Ms. Williams argues that the ALJ erred in not having a medical expert review this additional evidence of A.H.'s impairments. (*Id.* at 11–12). Also relying on SSR 96-6p, the Commissioner argues that the ALJ did not err because he had a discretionary right under the ruling not to obtain an updated expert medical report. The Commissioner claims that substantial evidence supports the ALJ's decision because state agency experts Drs. Brister and Altman reviewed the record and reached the same conclusions as the ALJ concerning whether A.H.'s limitations functionally equaled a listed impairment. (Def.'s Mot. 8–9).

SSR 96-6p requires an ALJ to consider opinions given by state agency medical experts like Drs. Brister and Altman. An ALJ is not bound by a state agency doc-

tor's report, but he may not ignore these opinions and must explain the weight given to them in his decision.[11] The ruling also addresses the necessity for obtaining updated medical opinions to address at step three whether a claimant's impairments or combination of impairments meet or medically equal a listing requirement. "When additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's finding that the" claimant's impairments are not medically equivalent to a Listed impairment, the ALJ "must call on a medical expert." SSR 96-6p.

Neither Ms. Williams nor the Commissioner is persuasive on this issue because both parties overlook that SSR 96-6p does not apply to the ALJ's functional equivalence findings for A.H. On its face, that ruling only addresses the need for an ALJ to seek an updated medical opinion on whether or not a child's limitations meet or medically equal a listed impairment. Ms. Williams's argument, however, concerns the ALJ's conclusions on functional equivalence, not his medical equivalence finding. Functional equivalence involves substantially different criteria than those used to determine medical equivalence. Perhaps for this reason, the SSA specifically exempts an ALJ from SSR 96-6p's requirements when considering a child's functional limitations:

> While SSR 96-6p requires that an ALJ or the AC [Appeals Council] must obtain an updated medical expert opinion before making a decision of disability based on medical equivalence, there is no such requirement for decisions of disability based on functional equivalence. Therefore, ALJs and the AC (when the AC makes a decision) are not

---

[11] The ALJ in this case did not assign any particular weight to Dr. Brister's or Dr. Altman's reports, but Ms. Williams has not objected to this oversight.

required to obtain updated medical expert opinions when they deter-
mine that a child's impairment(s) functionally equals the listings.

SSR 09-1p. Like all SSA rulings, SSR 09-1p is "binding on all components of the So-

cial Security Administration," though it does not have the force of law. 20 C.F.R. §

402.35(b)(1); *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). The fact that it was

issued on February 17, 2009, well after the November 2008 administrative hearing,

does not alter its binding effect on the ALJ because it predates his February 23,

2009 decision. *See* 74 Fed. Reg. 7527-01 (February 17, 2009).  As a result, the Court

disagrees with Ms. Williams that SSR 96-6p required the ALJ to seek additional

medical testimony before assessing A.H. domains of functioning.[12]

Ms. Williams notes, however, that an ALJ is also statutorily obligated to take

certain precautions when evaluating a child's medical records. Section 1382c(a)(3)(I)

of the Social Security Act provides:

> In making any determination under this title . . . with respect to the
> disability of an individual who has not attained the age of 18 years . . .
> the Commissioner of Social Security shall make reasonable efforts to
> ensure that a qualified pediatrician or other individual who specializes
> in a field of medicine appropriate to the disability of the individual . . .
> evaluates the case of such individual.

42 U.S.C. § 1382c(a)(3)(I). The application of this statute is an issue of first impres-

sion in this Circuit, and Ms. Williams has not provided any authorities to guide the

---

[12] Other courts in this district have found that SSR 96-6p requires an ALJ to update
medical testimony when considering functional equivalence. *See*, *e.g.*, *Muhammad v. As-
true*, 585 F. Supp. 2d 1023, 1033 (N.D. Ill. 2008). *Muhammad*, however, predates SSR 09-
1p. Even if SR 09-1p had been issued after the ALJ's decision, moreover, it interprets and
consolidates existing regulations instead of establishing a substantive change in the law.
*See* SSR 09-1p. As such, it would have retroactive effect, and the Court would reach the
same result. *See Pope v. Shalala*, 998 F.2d 473, 483–84 (7th Cir. 1993) (stating that social
security rulings that clarify, rather than change, the law apply retroactively).

Court's analysis. In the only appellate decision involving section 1382c(a)(3)(I), the Ninth Circuit stressed that the statute's primary intent is to ensure that a qualified medical expert review a child's "case," meaning the record as a whole. *Howard v. Barnhart*, 341 F.3d 1006, 1014 (9th Cir. 2003) ("We interpret this to mean that the ALJ is required to make a reasonable effort to obtain a case evaluation, based on the record in its entirety, from a pediatrician or other appropriate specialist, rather than simply constructing his own case evaluation from the evidence in the record."). The ALJ in *Howard* cited numerous medical and school records to find that the claimant was not disabled, but like the ALJ in this case, he did not order a comprehensive expert review. *Id.* at 1013–14. As a result, the Ninth Circuit remanded the case so that the ALJ could obtain a review of the child's entire record, as required by the statute.

The Commissioner has not responded to this argument, thereby waiving all objections to it. *See Laborers' Int'l Union of North Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments that are not presented in response to a motion for summary judgment are waived). Nevertheless, Ms. Williams's reliance on section 1382c(a)(3)(I) does not warrant the relief she seeks. The SSA responded to *Howard* by issuing Acquiescence Ruling ("AR") 04-1(9). 60 Fed. Reg. 22578-03 (April 26, 2004). That ruling notes that the SSA distinguishes between a disability "determination" and a disability "decision." The former is defined under the regulations as involving disability rulings at the initial and reconsideration stage; the latter involves a decision by an ALJ or the Appeals Council. 20 C.F.R. § 416.1401. Regula-

tions in place at the time *Howard* was issued stated that the medical review required under section 1382c(a)(3)(I) must take place whenever the SSA makes a "determination" of disability, but they did not include the same requirement for a disability "decision" by an ALJ. *Id.* § 416.1015(e). Based on these regulations, the SSA was not obligated before *Howard* was issued to obtain a comprehensive medical review when, as here, an ALJ conducts a hearing and makes a disability decision. The SSA concluded in AR 04-1(9) that *Howard*'s requirement of a comprehensive medical review in both "decisions" and "determinations" should be limited to cases in which the child claimant resides within the Ninth Circuit. For all children outside the Ninth Circuit, *Howard*'s interpretation of the statute does not apply, and a complete review is required only at the initial and reconsideration stages, not at the ALJ or Appeals Council level. AR 04-1(9).

ARs do not have the force of law, but like all SSA rulings they are entitled to deference, except when they are clearly erroneous or inconsistent with the Social Security Act. *See Walker v. Sec'y of Health and Human Servs.*, 943 F.2d 1257, 1259–60 (10th Cir. 1991). Ms. Williams has not addressed this issue, and in the absence of any argument that AR 04-1(9) conflicts with the statute she relies on, the Court declines to address any potential inconsistencies between section 1382c(a)(3)(I) and AR 04-1(9). *Cf. Drake v. Barnhart*, No. Civ. 04-6084, 2005 WL 3078195, at *6 (E.D. Pa. Nov. 15, 2005) (finding that the court was bound by AR 04-1(9)'s language and that an evaluation of a claimant's case by state agency experts fulfills the requirements of section 1382c(a)(3)(I)).

Ms. Williams, however, has one final ground for objecting to the ALJ's decision not to obtain an updated medical review. As with the argument pursuant to SSR 96-6p, she claims that the evidence submitted after the hearing was never seen by a medical expert, and the fact that the ALJ determined A.H.'s functional limitations without a medical review of these documents means that the ALJ improperly "played doctor" and substituted his own judgment for expert medical determinations. The Commissioner has not responded to this claim, apparently relying on the same argument he asserted under SSR 96-6p: the state agency experts reviewed A.H.'s records, and the ALJ was entitled to rely on those reports to make his functional findings.

ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (citing cases). While it is true that an ALJ has the ultimate responsibility for determining disability, this obligation does not entitle him to ignore medical evidence or reach medical conclusions on his own. *See Williams v. Apfel*, 48 F. Supp. 2d 819, 825–26 (N.D. Ill. 1999). "The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). An ALJ's substitution of his own medical judgment, together with a disregard of relevant medical evidence, warrants reversal. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (citing cases).

The Court agrees with Ms. Williams's argument on this issue and notes that the facts on which her claim is based are considerably more extensive than she suggests. In his response to the SSR 96-6p issue, the Commissioner argued that the ALJ's functional analysis properly relied on the reports of the state agency experts, Dr. Brister and Dr. Altman. The ALJ's decision, however, does not support this claim and provides no ground for determining that the ALJ based his functional findings on either of these opinions. The ALJ did state in general terms that "the State Agency Medical consultants" supported his medical equivalence determination. (R. at 19). But the decision does not discuss these experts' functional findings in any manner, refer to their reports as part of the ALJ's own functional analysis, or even acknowledge that Dr. Brister and Dr. Altman made any functional determinations at all. Thus, the Commissioner cannot argue at this point that the ALJ used the state agency experts as a basis for his own functional determinations. *See Baker*, 410 F. Supp.2d at 766 ("Neither the Commissioner nor the court may supply reasons for the ALJ.").

Even if the decision could be construed as relying on the state agency reports, moreover, nothing in the record suggests that either Dr. Brister or Dr. Altman ever reviewed any of A.H.'s medical or school records after they issued their reports in May and July 2006, respectively. All these documents postdate the experts' reports, and the Commissioner has not cited any part of the record suggesting that either Dr. Brister or Dr. Altman subsequently reviewed them after their reports were issued. The result is that no medical expert reviewed over two years' worth of records

in this case, not just the relatively few documents Ms. Williams appears to have submitted after the administrative hearing.

With that point in mind, it is clear that the ALJ erroneously made independent medical findings by determining that A.H. did not have a "pervasive problem" with incontinence. (R. at 21). The ALJ cited two school, and one medical, record on this issue in his survey of the evidence—Dr. Gill's March 14, 2007 treatment note. (R. at 489). His discussion, therefore, took no notice of Dr. Gill's other notes on A.H.'s medical condition; Dr. Strayhorn's and Dr. Costello's diagnoses of enuresis and encopresis; A.H.'s referral to Dr. Lindgren for incontinence treatment; medical notes by Dr. Kalola showing a diagnosis of enuresis and encopresis; the referral to Dr. Hatch; and the treatments prescribed by A.H.'s doctors to help control her problem, including Dr. Hatch's and Dr. Kalola's recommendation of a voiding diary and prescriptions for Miralax and Enablex. No medical expert ever reviewed this information to evaluate the severity of A.H.'s condition or how it affected her ability to care for herself compared to nonimpaired children her age. Thus, in dismissing the extent of A.H.'s incontinence problem, the ALJ failed to account for substantial portions of the medical evidence in the record and impermissibly constructed his own version of this important medical issue without guidance from a qualified expert.

## C. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to [his] conclusion" concerning A.H.'s domains of functioning discussed herein. *Steele*, 290 F.3d at 941 (internal quotation omitted). The Court is unable to

assess the validity of the ALJ's reasoning and findings because he overlooked portions of the record, failed to link his findings to the evidentiary survey contained in the decision, and applied incorrect legal standards to the domain of caring for oneself. On remand, the ALJ shall re-evaluate A.H.'s ability to acquire and use information, attend and complete tasks, and care for herself, giving due attention to her incontinence problems and her need for a supporting environment both at school and at home. The ALJ shall also have a qualified medical expert review those medical and school documents that were not available to the state agency experts when they issued their 2006 reports.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 21] is **GRANTED**, and Defendant's Cross-Motion for Summary Judgment [Doc. 23] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: May 18, 2011

*Nan R. Nolan*
NAN R. NOLAN
United States Magistrate Judge